1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ADELMA ANAYA, et al.,

              Plaintiffs,

    v.

MACHINES DE TRIAGE ET BROYAGE, et al.,

              Defendants.

Case No. 18-cv-01731-DMR

**ORDER GRANTING CROSS-DEFENDANT AUGER, S.A.S.'S MOTION TO DISMISS**

Re: Dkt. No. 78

Plaintiffs Adelma Anaya, Tanya Anaya, Vanessa Anaya, and Alberto Anaya, Jr. filed this wrongful death action on March 20, 2018 [Docket No. 1 (Compl.).] Jurisdiction is based on the diversity of citizenship between the parties. Defendant Machines de Triage et Broyage ("MTB") filed a cross-complaint against Auger, S.A.S. ("Auger"). [Docket No. 49.] Auger now moves to dismiss MTB's cross-complaint on the basis that the court lacks personal jurisdiction over it.

The court held a hearing on February 14, 2019. For the reasons stated below, the motion is granted.

## I.    BACKGROUND

Alberto Anaya, Sr. ("Decedent") worked at Alco Iron & Metal Company ("Alco"). On June 30, 2017, a piece of equipment fell on him causing fatal injuries. Compl. ¶ 13. The equipment involved in the incident was a screw conveyor. The screw conveyor was part of a larger recycling system that Alco purchased from Defendant Wendt Corporation ("Wendt"), which is the North American Distributor of systems and products for MTB. [Docket No. 66 at 3.] Decedent was killed during the Recycling System installation process. *Id.* Plaintiffs are Decedent's next of kin. Compl. ¶ 4. The operative complaint alleges five claims for relief: wrongful death (negligence); survival action (negligence); strict products liability (manufacturing or design defect); strict products liability

(failure to warn); and negligent products liability (failure to warn).  *Id.* ¶¶ 20-87.

Auger is a company located in Villers-Cotterets, a small community in France, and is organized under the laws of France.  [Docket No. 78-3 ("Auger Decl.") ¶¶ 4, 6.]  Although Auger's primary business is designing machines for the food industry, it also designs and manufactures screw conveyors.  *Id.* ¶¶ 12-13.  Auger designed and manufactured the screw conveyor at issue in this case.  [Docket No. 91-1 ("Poncet Decl.") ¶¶ 5-12.]

Auger has a total of fifteen to twenty employees, none of whom live or work in the United States.  Auger Decl. ¶ 5.  Auger designs and manufactures all of its products in France.  *Id.*  ¶ 14.  Auger does not have any offices in the United States, and does not make direct sales to any clients located in the United States.  *Id.*  ¶¶ 7-8.  All of Auger's sales are made in France and conducted in French.  *Id.*  ¶ 7.  Auger does not advertise or market any of its products in the United States, nor does it send any of its employees to any U.S. state to sell or market its products.  *Id.* ¶¶ 9-10.  Auger does not install any product that it designs or manufactures in the United States, and as a general practice, does not install screw conveyors for any client.  *Id.* ¶¶ 25-26.

Auger does not distribute screw conveyors to any individual or business in the United States; the screw conveyors are distributed to the United States by other entities, including MTB.  *Id.* ¶¶ 15-16.  Auger knows that MTB resells some of its screw conveyors to purchasers in the United States, while others are distributed in Asia and Europe.  *Id.* ¶ 23.  Although Auger does not design or manufacture its screw conveyors to conform to the laws of any specific U.S. state, it does design and manufacture screw conveyors based on the electrical specifications of a particular country, such as the United States.  Auger Decl. ¶¶ 15, 18.

Auger now moves to dismiss MTB's cross-complaint on the basis that this court lacks personal jurisdiction over it.

## II.    ANALYSIS

### A.    Legal Standards Regarding Personal Jurisdiction

"Where . . . there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits."  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006).  Because California's long-arm

statute allows a court to exercise personal jurisdiction to the extent permitted by the Due Process Clause of the United States Constitution, "the jurisdictional analyses under state law and federal due process are the same." *Id.*; *see also* Cal. Civ. Proc. Code § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.").

In a motion to dismiss for lack of personal jurisdiction, the non-moving party "bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where, as here, a district court rules on a motion to dismiss without holding an evidentiary hearing, the non-moving party "need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "[U]ncontroverted allegations in the complaint must be taken as true . . . [and] [c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

Personal jurisdiction may be either general or specific. *Bristol-Myers Squibb Co. v. Sup. Ct. Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (U.S. 2011). MTB does not assert nor do the pleadings support the existence of general jurisdiction. Accordingly, the only issue is whether the court may exercise specific jurisdiction over Auger.

Due process requires that a defendant have "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted). The Ninth Circuit uses a three-part test to analyze whether a party's "minimum contacts" comport with the doctrine articulated in *International Shoe*:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and

> protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). If the plaintiff meets its burden on the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)). If any of the three factors are not met, "jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995).

### B.   Purposeful Direction and the *Calder* Test

Under the first prong of the specific jurisdiction test, purposeful availment and purposeful direction are distinct concepts. *Schwarzenegger*, 374 F.3d at 802. Purposeful availment is most often used in cases related to contract disputes, and purposeful direction is used in cases, such as this products liability action, that sound in tort. *Id.* Purposeful direction is analyzed under the three-part test derived from *Calder v. Jones*, 465 U.S. 783 (1984): "that the defendant allegedly ha[s] (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). The *Calder* test is appropriate here, because MTB alleges tortious conduct by Auger.

### 1.   Intentional Act

In the Ninth Circuit, an "intentional act" is an "an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results." *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) ("*Washington Shoe*") (abrogation on other grounds recognized by *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017)).

Here, MTB alleges that Auger committed an intentional act by selling the screw conveyor at issue to MTB. [Docket No. 91 (Opp.) at 11.] Auger does not dispute that this prong of the *Calder*

test is satisfied.

## 2. Express Aiming

The second prong of the *Calder* test requires that the non-forum defendant "expressly aimed" the intentional act at the forum state. *Dole Food Co.*, 303 F.3d at 1111. Auger argues that it did not purposefully direct its activities to California because MTB unilaterally distributed the screw conveyor to this state. [Docket No. 78 (Mot.) at 8.] MTB contends that Auger's "manufacture of a product, that was known to be destined for California, and was specifically configured for use in the United States, constitutes an 'act' aimed at the forum state." Opp. at 11.

As a preliminary matter, MTB has not established that Auger knew that the screw conveyor was destined for California. The exhibits attached to MTB's opposition are emails that refer to the fact that Auger knew the product would be used in the "USA" for the "Alco project," but nothing in the record contains any reference to Auger's knowledge that the screw conveyor would be used in California specifically. *See* Opp., Exs. A-D. Declarant Jeremie Poncet states that he "had telephonic conversations with Stéphane Dolle and Sébastien Auger of AUGER SAS company, wherein it was confirmed that the screw conveyors were intended for use by Alco Iron & Metal at its facilities in California." Poncet Decl. ¶ 8. However, the construction of this sentence is ambiguous; it is unclear whether Poncet is testifying that Auger confirmed that the screw conveyor was headed to California specifically, or whether the parties to the call merely confirmed that it was headed to Alco, which happens to be in California.

Even assuming Auger knew its product was destined for California, such knowledge would be insufficient to establish that Auger expressly aimed its conduct at California. MTB cites *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945 (N.D. Cal. 2015) for the proposition that "where a defendant *knows*—as opposed to being able to foresee—that an intentional act will impact another state, then the 'expressly aimed' requirement is satisfied." 125 F. Supp. at 960-61. This language comes from *Washington Shoe*, where the Ninth Circuit held that the "expressly aimed" requirement is satisfied where the non-resident defendant knew that its intentional acts would impact the plaintiff in the forum state. *See* 704 F.3d 668 at 675-678. *Washington Shoe*, which was decided in 2012, was still good law when *Adobe* was decided in 2015. However, in 2017, the Ninth Circuit

recognized that *Washington Shoe* was abrogated by the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014). *See Axiom Foods, Inc.*, 874 F.3d at 1071 ("In light of the Court's instructions in *Walden*, mere satisfaction of the test outlined in *Washington Shoe*, without more, is insufficient to comply with due process."). *Walden* held that knowledge that harm may occur to a forum resident is not sufficient because "[t]he proper question is whether the defendant's conduct connects him to the *forum* in a meaningful way," not merely to a forum resident. 571 U.S. at 278 (emphasis added); *see also Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1148 (9th Cir. 2017) ("Plaintiffs were required to make a prima facie showing that Defendants' alleged actions were directed at [the forum state], not just at individuals who reside there."). Therefore, even assuming Auger knew that the screw conveyor was to be sold to a California company, that knowledge alone would not establish that Auger expressly aimed its conduct at California. *See Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) ("Even a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state.") (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987)).

MTB also argues that Auger expressly aimed its conduct at California because it "specifically configure[d] the screw conveyors for use in this State." Opp. at 12. While Auger admittedly "designs and manufactures a particular screw conveyor based on the electrical specifications of a particular country," it does not "design or manufacture its screw conveyor to conform to the laws of any specific state." Auger Decl. ¶ 15. The issue, then, is whether Auger's conduct in configuring a product for use in the United States (but not for a particular state) is sufficient to meet the second prong of the *Calder* test.

In *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011), the Supreme Court issued a plurality opinion in which six justices took the position that specific jurisdiction over a foreign defendant requires conduct directed specifically to the forum state rather than to the United States

as a whole.[1]  In that case, the non-forum defendant was an English manufacturer of a metal-shearing machine that allegedly caused an injury in New Jersey.  564 U.S. at 878.  Although the manufacturer retained an independent Ohio-based company to sell its products in the United States, the manufacturer itself did not sell its machines to buyers in the United States apart from the U.S. distributor.  *Id.*; *see also id.* at 896-97 (Ginsburg, J., dissenting).   The manufacturer had no office in New Jersey, did not pay taxes or own property there, and did not advertise or send any employees to New Jersey.  *Id.* at 886.  There was no allegation that the distributor was under the manufacturer's control.  *Id.* at 878.  However, the English manufacturer held United States patents on its technology, and the "the U.S. distributor structured [its] advertising and sales efforts in accordance with [the manufacturer's] direction and guidance whenever possible, and . . . at least some of the machines were sold on consignment to the distributor."  *Id.* at 879 (quotations omitted).  Additionally, representatives of the manufacturer and distributor attended conventions in the United States to advertise the machines, although none of the conventions occurred in New Jersey.  *Id.*  at 878.

In the plurality opinion, the Supreme Court found that specific jurisdiction over the manufacturer did not exist.  Four justices concluded that "[t]hese facts may reveal an intent to serve the U.S. market, but they do not show that [the manufacturer] purposefully availed itself of the New Jersey market."  564 U.S. at 886.  Justice Breyer and Justice Alito concurred in the judgment, finding that the relevant facts did not show specific targeting of the New Jersey market, "such as special state-related design, advertising, advice, marketing, or anything else."  *Id.* at 889 (Breyer, J., concurring).

Thus, a majority of six justices in *J. McIntyre* rejected the theory put forth by MTB.  As was the case with the foreign manufacturer in *J. McIntyre*, Auger has no offices, nor does it advertise, in California.  It makes no sales to consumers in California, and it does not send its employees to California to sell or market its products.  While the manufacturer in *J. McIntyre* retained an Ohio-based company to distribute its products in the United States, Auger has even fewer connections to the United States, because it sells its products in France to independent distributors like MTB who

---

[1] MTB appears to concede that *J. McIntyre* does not support its position because it discusses only Justice Ginsburg's dissent in that case.  *See* Opp. at 15-16.

may or may not distribute them to the United States. *See J. McIntyre*, 564 U.S. at 896-97 (Ginsburg, J., dissenting). The facts in this case are also weaker than those in *J. McIntyre* in that the English manufacturer in that case held U.S. patents for its designs and also sold products on a consignment basis to its U.S. distributor. *See* 564 U.S. at 879. Here, at most, Auger configures some screw conveyors to conform to U.S. electrical specifications. Even if the record establishes that Auger has directed conduct toward the United States as a whole, they do not show that Auger has directed any conduct toward California specifically. *See id.* at 884. ("[A] defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State.").

MTB cites *Patterson v. Home Depot, USA, Inc.*, 684 F. Supp. 2d 1170 (D. Ariz. 2010) for the proposition that "a manufacturer and/or designer of a product can be found to have directed the product to a specific forum, when it delivers a defectively designed product to the United States as a whole, with reason to know that the product will be used in the forum state." Opp. at 13. In *Patterson*, a German manufacturer of ladders founded a wholly-owned subsidiary for the purpose of distributing ladders in the United States. 684 F. Supp. 2d at 1173. In determining whether personal jurisdiction over the manufacturer existed, the court found that the company purposefully availed itself of jurisdiction in Arizona, because the company "placed its design . . . into the 'stream of commerce' and directed that design toward U.S. consumers by establishing an American subsidiary and giving that subsidiary a license to manufacture ladders in accordance with that design." *Id.* at 1183. The court also noted that the manufacturer "designed the ladder according to American standards and sought U.S. patents for those designs." *Id.* It accordingly held that that the manufacturer designed the product for the market in "states such as Arizona." *Id.*

*Patterson* was decided before *J. McIntyre* and *Axiom Foods* and does not reflect the current law on specific jurisdiction. In addition, *Patterson* is distinguishable from this case because a fundamental consideration in that case was that the manufacturer established an American subsidiary for the specific purpose of distributing its products in the United States. *Id.* at 1173. Here, Auger does not make any sales in the United States, does not advertise or market its products here, nor does it distribute any of its products in the United States. Auger Decl. ¶¶ 8-11. Nor is there any allegation that Auger has established a subsidiary in the United States that conducts any

of those activities.

Finally, MTB points out that an employee of Auger travelled to California in October 2018 to assist in the investigation of the incident underlying this case. Poncet Decl. ¶ 13. The Auger employee added a weld to prevent a holding clamp from slipping up the tube of the screw conveyor. *Id.* The additional weld was intended to address the defect that allegedly led to the collapse of the screw conveyor. *Id.* These facts are of no import, for any subsequent remedial conduct by Auger does not affect the specific jurisdiction analysis, which requires courts to "examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction." *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987). Specific jurisdiction "require[s] that individuals have fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Id.* (quoting *Burger King*, 471 U.S. at 472) (further citations and internal quotations omitted). "[T]he fair warning that due process requires arises not at the time of the suit, but when the events that gave rise to the suit occurred." *Id.* Accordingly, for the purpose of the jurisdictional analysis, the court considers Auger's contacts with California at the time that the incident occurred in June 2017.

At the hearing, MTB attempted to distinguish *Steel* by asserting that *Steel* addressed a more discrete timing issue. Specifically, *Steel* involved enforcement of a divorce decree against a defendant who had moved out of California since the divorce proceedings. *See* 813 F.2d at 1547-48. The trial court examined the defendant's contacts with California at the time the enforcement action was filed and concluded that his contacts were insufficient to establish specific jurisdiction. *Id.* at 1548. The Ninth Circuit reversed, determining that the defendant's contacts with California "during the marriage, separation, and divorce proceedings determine whether the district court had personal jurisdiction over him," rather than the defendant's contacts at the time the complaint was filed. *Id.* at 1549-50. MTB argues that *Steel* is distinguishable because in this case, the subsequent repair by Auger was part of the events underlying the complaint, and therefore is properly considered in determining Auger's contacts with California. Audio Transcript of February 14, 2019 Hearing at 11:27:05-11:28:01. Auger responds that the repair was not part of the underlying incident, and argues that it would be unfair to subject a defendant to specific jurisdiction for taking

remedial action subsequent to the actual injury. *Id.* at 11:33:32-11:34:00.

When asked for authority supporting its position, MTB cited to the plurality opinion in *J. McIntyre* for the proposition that the court must consider the "totality of the circumstances" in order to determine whether specific jurisdiction exists on a case-by-case basis. *J. McIntyre*, however, does not use the phrase "totality of the circumstances," and MTB acknowledged that *J. McIntyre* did not address the issue of the timing of events that a court may consider in a jurisdictional analysis. Nor does MTB's theory align with the "fair warning" concern expressed by the Ninth Circuit in *Steel*. *See Steel*, 813 F.2d at 1549. The wrongful conduct alleged in MTB's cross-complaint relates to the fatal injury that occurred on June 30, 2017, not to the repair that Auger later made to the screw conveyor. *See* Docket No. 49.

In sum, MTB has not met its burden to show that Auger expressly aimed its conduct at California. Accordingly, the court need not reach the remaining aspects of the *Calder* or minimal contacts tests.

## III.  JURISDICTIONAL DISCOVERY

In the alternative, MTB requests the opportunity to conduct discovery on the jurisdictional issue. Opp. at 16. Auger opposes on the basis that MTB has not set forth any facts that connect Auger to California. Mot. at 9-10.

A court may permit jurisdictional discovery "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977). Courts in this district have held that "a plaintiff need not establish a prima facie case of personal jurisdiction before it can obtain jurisdictional discovery." *Teras Cargo Transp. (Am.), LLC v. Cal Dive Int'l (Australia) Pty Ltd.*, No. 15-cv-03566-JSC, 2015 WL 6089276, at *8 (N.D. Cal. Oct. 16, 2015) (citing cases). A court may grant jurisdictional discovery if the request is based on more than a "hunch that it might yield jurisdictionally relevant facts," *see Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir.2008), or more than "bare allegations in the face of specific denials." *See Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (citation omitted); *see also Calix Networks, Inc. v. Wi-Lan, Inc.*, No. 09-cv-06038-CRB (DMR), 2010 WL 3515759, at *4 (N.D. Cal. Sept. 8, 2010) ("[A] plaintiff

must present a colorable basis for jurisdiction, or some evidence constituting a lesser showing than a prima facie case." (quotations omitted)). It is not an abuse of discretion to deny jurisdictional discovery "when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n. 24 (9th Cir. 1977).

Here, MTB argues that there are "unresolved, controverted matters including but not limited to other ongoing projects wherein AUGER manufactured component parts configured for the American market." Opp. at 17. They claim that "MTB has sold four other recycling systems to customers . . . in the United States that utilize component parts manufactured by Auger." Poncet Decl. ¶ 14. At the hearing, MTB also argued that jurisdictional discovery would allow them to investigate whether any part of the screw conveyor at issue was specifically configured for use in California. However, MTB has not presented any facts suggesting that Auger has connections to California. MTB does not claim that Auger specifically designed the other recycling systems for use in California, rather than in the United States as a whole. Nor has MTB presented any facts indicating that the screw conveyor at issue may have had state-specific modifications. In sum, MTB's arguments amount to no more than a "hunch" that jurisdictional discovery would uncover jurisdictionally relevant facts.

Accordingly, MTB's request to take additional discovery is denied.

## IV. CONCLUSION

For the foregoing reasons, the court grants Auger's motion to dismiss for lack of personal jurisdiction. MTB's cross-complaint is dismissed without leave to amend.

**IT IS SO ORDERED.**

Dated: March 7, 2019



Donna M. Ryu
United States Magistrate Judge